## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **SANDRA B. KNIGHT** | : | |
| 1440 Weaver Avenue | : | |
| Petersburg, VA  23808 | : | |
| | : | |
| Plaintiff, | : | **CIVIL ACTION NO.:** |
| | : | (Jury Trial Demanded) |
| v. | : | |
| | : | |
| **JAMES MATTIS, SECRETARY,** | : | |
| **DEPARTMENT OF DEFENSE** | : | |
| 1000 Defense Pentagon | : | |
| Washington, D.C.  20301-1000 | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## COMPLAINT

Plaintiff, Sandra B. Knight ("Ms. Knight" or "Plaintiff"), by and through her undersigned

counsel, hereby brings this Complaint against James Mattis, Secretary of the United States

Department of Defense ("Defendant"), by averring as follows:

## INTRODUCTION

1.      The present lawsuit is brought by Ms. Knight, a former Suicide Prevention

Program Manager who was employed by Department of the Army ("Army" or "Agency"),

alleging retaliation as well as discrimination in federal employment based on gender and

disability.

2.      Ms. Knight's claims arise pursuant to Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §2000e *et seq*., 42 U.S.C. §2000e- 16(c) (collectively referred to as "Title

VII"); Section §501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et. seq.* (hereinafter the

"Rehab Act"); and 29 C.F.R. §1614.407, all of which permit a federal employee such as Ms.

Knight to file suit in federal court against the head of a federal governmental agency to address

invidious discrimination in the terms and conditions of employment.  This action also seeks relief pursuant to 42 U.S.C. §2000e- 3(a), as amended, which prohibits retaliation against an employee for engaging in protected activity.

3.      Ms. Knight, a female and qualified individual with a disability as of the filing of this action, seeks declaratory and equitable relief, as well as compensatory damages, attorney's fees and costs for violations in accordance with the aforementioned causes and implementing regulations.  These claims, supporting facts and damages set forth in this action are referred to individually or, at times, collectively as the "Lawsuit."

## PARTIES

4.      Ms. Knight is currently an adult resident of the Commonwealth of Virginia, at 1440 Weaver Avenue, Petersburg, VA  23803.  At all times relevant to this Lawsuit, Ms. Knight was employed by Defendant and was an "employee" within the meaning of Title VII the Rehab Act and other governing regulations.

5.      Defendant, James Mattis, Secretary, United States Department of Defense ("DoD" or "Defendant"), is an "employer" and agency or department head within the meaning of Title VII, the Rehab Act and other governing regulations.

6.      The Army operates an anti-substance abuse program at the United States Army Garrison known as Red Cloud, Area 1, Camp Casey, South Korea ("USAG Red Cloud"), which is administered through the Army Center for Substance Abuse Programs ("ASAP").   At all times relevant to this Lawsuit, Ms. Knight was stationed at USAG Red Cloud and working under the Army's Directorate of Human Resources.  Similarly, all the actors and individuals identified herein were also employees of USAG Red Cloud during this time frame acting within the scope and course of their employment and authority.

## JURISDICTION AND VENUE

7.      Jurisdiction of this matter arises under 28 U.S.C. §1331 with federal questions involving Title VII, the Rehab Act and other governing federal sector regulations.

8.      Venue is proper in the Greenbelt Division of the United States District Court for the District of Maryland under 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f)(3), as the employment records for all or certain Army elements are maintained and administered in Maryland, including at the Washington National Records Center in Suitland, which is within this District and Division.

## ADMINISTRATIVE UNDERTAKINGS

9.      On or about December 29, 2015, Ms. Knight filed a formal complaint with USAG Red Cloud's Equal Employment Opportunity Office alleging discrimination on the basis of gender, disability and retaliation.  The complaint was received by the Agency and thereafter assigned a Docket Number of ARUIJONG15OCT03959.

10.     Following the filing of the complaint, the USAG Yongsan EEO Office took the lead in administrative processing due to failure of the USAG Red Cloud's EEO office to properly handle these Agency responsibilities.

11.     On May 24, 2016, the Agency accepted the complaint for investigation.  On June 1, 2016, the Agency issued an amendment expanding the scope of the allegations to be investigated.

12.     After the issuance of the Report of Investigation ("ROI"), Ms. Knight sought a Final Agency Decision ("FAD") on November 3, 2016, but to date no formal FAD has been issued by the Agency.

13.     On June 1, 2017, the EEO Counsel for USAG Red Cloud issued an Agency request for FAD, even though such an election has been sought by Ms. Knight as far back as November of 2016.  To date, no FAD has been made.

14.     All conditions precedent necessary to file this Lawsuit have been met and this action is timely filed.

## FACTS

### Initial Background in South Korea

15.     Ms. Knight was a career employee with the Army serving in the Far East Region in several installations in South Korea since 2009, holding various formal or informal positions within the Army Substance Abuse Program ("ASAP"), including but not limited to Social Worker, Employee Assistance Program Manager, Prevention Program Manager and, most recently, Suicide Prevention Program Manager (GS-0101-11).

16.     Ms. Knight first met Wayne Johnson ("Mr. Johnson"), when she began at USAG Red Cloud in 2009.  At that time, he was the Alcohol & Drug Control Officer.  In August of 2015, Mr. Johnson became Manager of  ASAP at USAG Red Cloud, where Ms. Knight was employed.

17.     Ms. Knight's positions at USAG Red Cloud involved the more clinical and treatment aspects of ASAP, whereas Mr. Johnson's duties involved a more proactive role in the preventative aspects of ASAP.

18.     As such, from 2009 through 2013, Ms. Knight was not supervised by Mr. Johnson on a day-to-day basis from 2009 through 2013.  Mr. Johnson, however, did have considerable sway and influence over the directorate and ASAP program, during this period.

### EEO Activity by a Female Employee

4

19.     In early 2011, Ms. Knight, in her capacity as an EAP counselor for the ASAP program in Area 1, was approached by a female employee (name redacted for privacy).

20.     At the time, this female was assigned to USAG Yongsan Area 2, and worked under and reported to Mr. Johnson.

21.     In the course and scope of her duties, Ms. Knight provided EAP counseling to this female.

22.     During these counseling sessions, this female raised some very serious allegations concerning the actions, treatment and behavior towards her by Mr. Johnson which, if true, were in blatant violation of Agency EEO policies and Management Directives.

23.     This female subsequently filed an EEO complaint with the Agency concerning Mr. Johnson's behavior.

24.     In the course of the Agency EEO process, Ms. Knight was named as a witness for this female, and, during the investigative process, Ms. Knight provided a written statement in support of this female's allegations.

<u>Threats and Interference by Mr. Johnson</u>
(Anyone who gets involved will be "very, very sorry")

25.     Upon information and belief, Mr. Johnson became aware that this female had initiated an EEO process against him and that this female had asked Ms. Knight and others to support her and serve as her witnesses.

26.     Thereafter, Mr. Johnson telephoned Ms. Knight on several occasions and pressured her to keep her mouth shut or avoid involving herself in the EEO proceedings and he did so under threat of reprisal.

27.     For instance, on or about March 10, 2011, Mr. Johnson called Ms. Knight directly in an attempt to feel her out and told her "I am calling to let you know that you have been named

as a person who is involved in some of my employees being unhappy with how I do things. These disgruntled employees may want you to make a statement against me."

28.     Mr. Johnson then pointedly stated that if anyone  got involved in the case against him, "they were going to be very, very sorry."

29.     Approximately three weeks later, Mr. Johnson again called Ms. Knight directly in a highly agitated state and openly questioned why she was supporting the female in her proceedings.

30.     Mr. Johnson first asked, rhetorically: "what have I done to make you so angry at me and why do you hate me?" Ms. Knight took these statements to mean that Mr. Johnson had, in fact, learned of her involvement in the EEO process.

31.     As the conversation continued, Mr. Johnson warned Ms. Knight that "I have hired me an attorney and I want you to know to just be careful." He continued by saying "everyone that is involved is going down on this one.  It's going to be big trouble." After this conversation, Ms. Knight reported this conversation to the  8th Army EEO Officer, Anna Rivera and to her supervisor Carrie D. Hicks.

32.     During this female's EEO process, Mr. Johnson began to follow through with his threat of retaliation.  It was not long after Mr. Johnson's conversations with Ms. Knight that she received word she was not chosen for the position of Alcohol & Drug Abuse Program Specialist within ASAP, a position that had been advertised in May of 2011 and Ms. Knight had applied for.

33.     The position in question was one for which Ms. Knight was particularly qualified and well suited, far more than the actual selectee, a male named Husong Pok Chong ("Mr. Chong").

<u>Ms. Knight Initiates EEO Action Against Mr. Johnson for Non-Selection</u>

34.    Ms. Knight initiated the EEO complaint process and asserted that her  non-selection was reprisal by Mr. Johnson due to Ms. Knight's involvement and support in the female's EEO complaint.

35.    Ms. Knight alleged that discrimination, based in part on her gender, also played a role in the non- selection insofar as Mr. Johnson had a history of misogynistic and poor treatment towards Ms. Knight and other women in the workplace.

<u>Removal of Mr. Johnson from Korea;<br>Appointment of Ms. Knight to Suicide Prevention Program Manager</u>

36.    Upon information and belief, as a result of the serious EEO allegations brought to light , Mr. Johnson was presented with proposed discipline of some form.  What is known is that Mr. Johnson was stripped of  his supervisory responsibilities and appeared to have been involuntarily transferred or removed from USAG Yongsan, South Korea.

37.    Ms. Knight then resolved her EEO complaint and in an effort to partially remediate the contested allegations of retaliatory or discriminatory non-selection advanced by Ms. Knight, a negotiated compromise was reached, which resulted in Ms. Knight's appointment to the position of Suicide Prevention Program Manager in the summer/fall of 2013.

<u>Medical Leave of Absence for Back Surgery</u>

38.    In late 2014 or early 2015, Ms. Knight was forced to leave Korea and return 'stateside' in order to avail herself of a lengthy medical leave of absence in order to undergo and address serious back surgery, which had various resultant complications and involved a period of ongoing physical rehabilitation.

39.     In addition to her back issues, Ms. Knight is a qualified individual with a mental health disability who has suffered and continues to suffer from various panic disorders, anxiety disorders and associated medical conditions which were first diagnosed in or around June of 2002.

40.     Ms. Knight's disabilities and associated medical issues were severely exacerbated by Mr. Johnson's threats and awful treatment towards her in the workplace, and she was only able to fully control, relieve and stabilize her condition following Mr. Johnson's actual removal and transfer from USAG Yongsan, South Korea.

41.     Ms. Knight was scheduled to return to duty in South Korea and resume her job duties and responsibilities as Suicide Prevention Program Manager in or around August of 2015 following her clearance to return to work and upon the end of her medical leave of absence.

<u>Mr. Johnson is Reinstated to Korea and Promoted</u>

42.     On August 23, 2015, Mr. Johnson was assigned and promoted to the position of Manager of the entire ASAP at USAG Red Cloud.  On or about this date, Mr. Johnson arrived in South Korea and assumed his duties immediately.

43.     As Manager (GS-0101-13) of ASAP, Mr. Johnson became the immediate direct report and supervisor of the Suicide Prevention Program Manager, a position held by Ms. Knight.

44.     In addition, Mr. Johnson became the immediate direct report and supervisor of the Biochemical Test Coordinator, a position within ASAP held by a female employee named "Ms. Benson."

45.     Ms. Knight was shocked to learn that while on leave, Mr. Johnson had not only been reinstated to USAG Red Cloud, but had now assumed the position of Manager and would serve as her direct supervisor.

46.     In other words, despite allegations from multiple women of actions constituting discrimination, misconduct, threats, reprisal and other bad acts for which he was ostensibly removed, Mr. Johnson found himself in the opportune position of returning to the scene of the crime with the Agency's imprimatur, this time with even more power to mistreat his female subordinates.

47.     Upon learning what had happened, Ms. Knight immediately complained to upper management that she could not work for Mr. Johnson given his past behavior, and specifically asked that she be removed from Mr. Johnson's supervision.

48.     However, no curative actions were taken in response to Ms. Knight's pleas for help and her concerns were altogether ignored.

<u>Disparate Treatment in the Terms and Conditions of Employment</u>

49.     As a result of the Agency's blatant and inexcusable inactions, Ms. Knight and Ms. Benson were unfortunately but predictably subjected to disparate treatment in the terms and conditions of their employment by Mr. Johnson.

50.     Specifically, from August through December of 2015 and beyond, not only did Mr. Johnson engage in further acts of retaliation stemming from Ms. Knight's prior protected activity, but he also subjected her to disparate mistreatment on the basis of her gender as well as her disability, which he not only failed to reasonably accommodate but purposely mistreated her because of the disability.

51.     For example, Mr. Johnson is very demeaning towards women and Ms. Knight in particular.  Upon assuming command of ASAP, Mr. Johnson on a continual and daily basis would single Ms. Knight out for negative comment about her work, even basis rote tasks.  He treated her dismissively and with great contempt, finding fault in the way she worked, though she had performed competently and expertly for years, without any issues.

52.     Instead of allowing Ms. Knight the autonomy she had experienced for many years, Mr. Johnson made it a point to take away her job freedom and subjected her to hyper-scrutiny concerning her activities.

53.     In addition, Mr. Johnson made it a pattern and practice to berate Ms. Knight in front of her colleagues on a daily basis, and further mocked her relentlessly in the workplace.

54.     Mr. Johnson took particular enjoyment in making Ms. Knight and or other female subordinates upset, afraid and placing them in a state of "anxiety."  Ms. Knight's daily work environment was imbued with Mr. Johnson's poisonous temperament.

55.     Mr. Johnson's treatment of females in general is remarkably worse than the respect he grants to male employees.  Mr. Johnson's also mistreated the employees who he believed and/or knew had complained about him.

Initial Staff Meeting (8/28/15)
(Complaints Will Not Be Tolerated)

56.     Upon taking over the position of Manager of ASAP in late August of 2015, Mr. Johnson called an initial 'all-hands' staff meeting of all his reports.

57.     The first introductory staff meeting set the tone for how Mr. Johnson intended to run the ASAP program and further revealed the pecking order and perceived value (or lack thereof) to which Mr. Johnson attached to certain subordinates.

10

58.     Curiously, Mr. Johnson made his very first order of business at the staff meeting to warn the staff that complaints would not be tolerated.  In particular, Mr. Johnson distributed EEO guidance paperwork and emphasized that the spreading of office gossip would be dealt with severely.

59.     It was clear from this statement that Mr. Johnson was attacking  the prior conversations of his misbehavior between the female and Ms. Knight to be a form of gossip.  Ms. Knight knew this topic was primarily directed at her, as an ongoing warning.

60.     Ms. Knight's understanding was confirmed when speaking to the new Prevention Coordinator, Eric Carheel ("Mr. Carheel"), who informed her that he had met and spoken with Mr. Johnson the night before at their shared lodging, and asked her if she had problems with Mr. Johnson in the past.

61.     Upon information and belief, absent discussions with Mr. Johnson, Mr. Carheel – as a new employee— would have no other way in which to know that Ms. Knight had a "problem" with Mr. Johnson.

62.     During the staff meeting, Mr. Johnson  humiliated and embarrassed Ms. Knight when he refused to  address her job description and duties within the unit.

63.     Mr. Johnson introduced all other staff members who were at the meeting and discussed what their job duties were.  Mr. Johnson, ignored Ms. Knight completely, as if she were not there, failing to introduce her or discuss her job duties.  Given that she was the only staff member treated in this fashion at the meeting, it was a very obvious omission.  Ms. Knight was keenly aware that Mr. Johnson's mistreatment was purposeful and done because he was angry for her role in the EEO complaints.

64.     During this same meeting, Mr. Johnson provided each employee with a copy of their job description, except for Ms. Knight.

65.     During the meeting, Ms. Knight asked why she did not receive a job description. Mr. Johnson retorted in a hateful tone:  "I don't know anything about you even having a job description or at this point even know who or where your program belongs to."  Mr. Johnson's remarks further exacerbated her humiliation in front of the entire staff.

66.     In marked contrast, when the new male Prevention Coordinator, Mr. Carheel, pointed out to Mr. Johnson that the job description given to him was not the same one that he applied for, Mr. Johnson responded in a friendly and cooperative fashion that: "I will be working with you on getting your job description rewritten."

67.     Finally, during the staff meeting, the issue of offsite training for the program heads was discussed.  As before, Mr. Johnson purposefully excluded Ms. Knight from these discussions.

68.     When Ms. Knight inquired as to why she was not being afforded this important training, Mr. Johnson retorted that training was for people who would be staying at ASAP.  He added with a smirk on his face: "Nothing personal, just business."

69.     Mr. Johnson's comment was made with a hostile, harassing and contemptuous tone, and was yet another message that he wanted Ms. Knight to leave sooner than later.

70.     In fact, during this meeting and several times in the ongoing weeks and months, Mr. Johnson would demand that Ms. Knight tell him when she planned to retire and leave.

71.     For a career employee who had devoted years of her life in dedicated exemplary service, Mr. Johnson's behavior was particularly hurtful and reflected a deep seated hostility.

This type of behavior by Mr. Johnson continued, unabated, which caused or contributed to an episodic worsening of her disabilities

### You're Only in Your Job Because You're a "Complainer" (9/8/15)

72.     On or about September 8, 2015, Mr. Johnson called Ms. Knight into a meeting where he proceeded to berate and belittle her. He prefaced the meeting by suggesting she agree to leave her position and mentioned it might be better for her due to her "issues and well being."

73.     Ms. Knight made clear that she was not ready to give up on her work or career. Mr. Johnson then reacted angrily. He told Ms. Knight in a snarling and harsh tone she was not qualified to do her job and began pointing out so-called problems with Ms. Knight's work abilities.

74.     By way of background, Mr. Johnson was aware Ms. Knight had been appointed as a Suicide Prevention Program Manager as part of a negotiated agency settlement stemming from her prior allegations of discrimination against him.

75.     Mr. Johnson held a retaliatory grudge and attitude against Ms. Knight due to her complaint against him. In this same meeting, Mr. Johnson told Ms. Knight that she was not qualified for the job and was only in it because she was a "complainer," in reference to her prior EEO activity.

76.     Mr. Johnson continued his attack against Ms. Knight, stating she was "not a manager," even though her position was Suicide Prevention Program Manager.

77.     When Ms. Knight pointed out to Mr. Johnson that her position was classified as managerial, he erupted with great hostility and stated: "I am the ASAP manager and I get to say what you do for the campaign."

78.     Immediately after the meeting ended, Mr. Johnson forwarded her an email detailing the duties of a manager, with the purpose of pointing out that she was not capable of handling the various duties listed in his email.  Thereafter, Mr. Johnson refused to recognize or refer to her a "Program Manager."

79.     Also, less than thirty minutes after this meeting, Mr. Johnson demanded that Ms. Knight stop whatever she was working on and immediately attend to him.  Mr. Johnson's ongoing tone and expectations were disrespectful such that he assumed Ms. Knight was at his beck and call to drop everything and run to his office, with the obvious message being that she was under his thumb and whatever work she was doing was unimportant and inconsequential.

80.     This type of behavior against Ms. Knight continued until Ms. Knight was forced to retire.  Ms. Knight noticed that Mr. Johnson's male employees were not treated in this fashion.

81.     Mr. Johnson's behavior created a toxic atmosphere that served to unnerve and keep Ms. Knight on edge, which in turn triggered panic and anxiety attacks.  Mr. Johnson even knew that his behavior had this effect on Ms. Knight, which prompted him to do it and then he would use her reactions to support his statement that she was not up to the task of doing her job.

<u>"Don't Complain or Else"</u> (<u>9/9/15</u>)

82.     Mr. Johnson held a staff meeting on September 9, 2015.  Consistent with his misogynistic view that Ms. Knight and certain female employees were of better use in a quasi secretarial capacity, Mr. Johnson made Ms. Knight take the staff meeting notes.

83.     Males were not made to take the meeting notes and on this particular day there were two other males in the meeting but Mr. Johnson tasked Ms. Knight with taking the meeting notes.

84.     During this meeting, Mr. Johnson was, once again, outwardly abusive towards Ms. Knight as well as other female co-workers, including Ms. Benson.  At one point, in response, Ms. Knight voiced her opinion – and what many others were thinking— that the ASAP organization was simply not functioning as a team.

85.     Mr. Johnson immediately took this as a personal attack, and became to glare and scowl at Ms. Knight and began shaking in anger.

86.     He then bellowed that Ms. Knight would report to his office immediately after the staff meeting to go over her campaign plans.  Mr. Johnson also told her point-blank "not to complain or else."

87.     The campaign in question was the 'Plan for Suicide Prevention,' which had long been in place and approved by Carrie Hicks ("Ms. Hicks"), the prior ASAP Manager and Command well before Mr. Johnson's arrival.

88.     Ms. Knight was in charge of the Plan for Suicide Prevention campaign, which involved at leave five major job elements.

89.     As directed, Ms. Knight went to Mr. Johnson's office and began to discuss certain aspects of the campaign, but was quickly shut-down and interrupted by Mr. Johnson who stated in a very condescending and dismissive tone that he did not like the plans that were in place.

90.     Mr. Johnson then proceeded to remove and strip at least three of her major elements for the campaign and her job duties, and stated that she was not qualified to perform them, despite the fact that she had been previously rated as excellent by Ms. Hicks for such job elements and had additionally been commended by 8th Army General Vandel for her work.

91.     Out of frustration of having her job minimized and suffering a practical demotion, Ms. Knight asked for a list of written goals and a new job description.

92.     This request also angered Mr. Johnson, and he responded, in part, by stating that: "I do not want you to partner with MRT's, if anyone wants to go there for training they can go on their own."  Mr. Johnson was speaking of Ms. Knight's responsibilities of teaming with Resilient Training Leaders to educate staff, and his dictate in this regard had the effect to taking away one of the most visible and key components of her Manager position.

93.     After the meeting and later in the day, Mr. Johnson continued his assault of her position by approaching Ms. Knight and openly demanding: "Who told you were qualified to carry the suicide prevention phone?"

94.     Mr. Johnson knew that Ms. Knight was certified, had undergone both ASIST and ACE suicide and intervention training, and had performed that task for years.  Notwithstanding, he stated:  "I'm not sure that makes you qualified to have the phone."

95.     This was but another major responsibility that Mr. Johnson had stripped from Ms. Knight in the course of one day, and it was causing her to suffer great anxiety, stress, and panic attacks.

96.     Approximately one hour later, Ms. Knight received a call from Mr. Johnson demanding she tell him the time of a scheduled Community Health Promotion Council meeting. Ms. Knight responded in conversational tone that "I believe it is 23 of September."  Instead of acknowledging this, Mr. Johnson curiously harped on her choice of words and snidely asked if "that was the date or did you just pull that date out?"

<u>Panic Attack- Captive Environment</u> (9/14/15)

97.     Following a morning staff meeting, Mr. Johnson directed Ms. Knight to come to his office for a meeting and also asked Mr. Carheel to attend.

98.     During the meeting in Mr. Johnson's office, he began to humiliate Ms. Knight and threatened her in a condescending fashion that her program was now in serious trouble, thus causing her to fear for her job.

99.     In the midst of this meeting, Ms. Knight began experiencing the onset of a debilitating panic attack, which is frightening and can quickly escalate with feelings of terror and extreme fear.

100.    Ms. Knight was able to voice to Mr. Johnson that she was having a  panic attack, did not feel safe in his presence and needed to leave immediately.

101.    For individuals suffering from panic and anxiety attacks, it is critical to quickly remove oneself from the person or threatening environment causing or contributing to the situation and begin to regain control in order to de-escalate, calm and mitigate the attack.  In fact it is basic common sense.

102.    Instead of permitting Ms. Knight to leave and address her medical condition as requested, Mr. Johnson denied Ms. Knight's request.  This meant that Ms. Knight was being confined against her will while experiencing a panic attack.  Mr. Johnson directed Mr. Carheel to leave and then he called in a high level supervisor named Joyce Clem ("Dr. Clem") to come to his office, thus heightening Ms. Knight's  fear and panic.

103.    At that point, Ms. Knight was in a dangerous medical state and experiencing high levels of anxiety.

104.    Fearing for her own safety, she again attempted to leave Mr. Johnson's office at which point he announced in a very loud and physically intimidating fashion to NOT WALK OUT OF THAT DOOR, all of which served to spike her panic and terror of being captive even further, thus further exacerbating the disabling episode.

105.    Ms. Knight then reached out to Herbert (Bud) Rader ("Mr. Rader"), via telephone, one of her upper level supervisors and Director of Human Resources.  She was able to report that she was having a panic attack but was not permitted to leave Mr. Johnson's office and asked permission to go home.

106.    Thankfully, Mr. Rader allowed her to separate from Mr. Johnson and allow her to return home.  Unable to operate a vehicle, Ms. Knight had to be driven home to her apartment.

107.    Later that same day while at home, Ms. Knight was contacted by Dr. Clem at Mr. Johnson's direction.

108.    Even though Ms. Knight was attempting to deal with an aggravated panic attack, Dr. Clem informed her that Mr. Johnson had cancelled her entire suicide prevention campaign effective immediately. This information caused Ms. Knight to immediately experience further trauma, anxiety, and panic.

109.    By his decision, Mr. Johnson unilaterally stripped all of Ms. Knight's responsibilities in blatant violation of Army disability policies, guidelines and stated practices.

110.    Further, the suicide prevention campaign was the primary most important and highly visible component of her position of Suicide Prevention Program Manager.  The cancellation of this program was adverse, negatively affected the terms and conditions of her employment, and sent the message to co-workers, Command and higher-ups that her supervisor perceived her as sick, unstable, incompetent and incapable, all of which caused serious harm to her career track.

111.    As a result of this incident and ongoing behavior of Mr. Johnson, Ms. Knight was forced to seek an appointment with her medical provider who had to increase her medication

levels to help ameliorate the anxiety caused and contributed to by her hostile and harassing work environment.

<u>Ongoing Reporting of Mr. Johnson's Behavior</u> (<u>9/16/15</u>)

112.    On September 16, 2015, Ms. Knight informed Mr. Rader, COL Haefner, and the EEO office about Mr. Johnson's ongoing and pervasive discrimination, reprisal and outrageous mistreatment towards her and other females, as well as the fact that she is a qualified individual with a disability suffering from anxiety disorder, panic attacks and associated conditions.

113.    Ms. Knight's medical condition was also disclosed during an EEO complaint in 2012, and was well known to her primary tormentor— Mr. Johnson, who would at times mock her and target her because she suffers from a medical condition.

114.    For her own safety and as a reasonable accommodation, Ms. Knight also requested (as she had done in  late August of 2015) that she be immediately transferred away from Mr. Johnson's supervision.

115.    Ms. Knight's requests for prompt, remedial action to remove her from further harm by Mr. Johnson, however, was not acted upon.

116.    The failure of the Agency to promptly act under the circumstances was particularly egregious because the Agency knew about the  allegations of harassing behavior and a hostile work environment lodged against by Mr. Johnson during the *same time frame* by another female employee – Ms. Benson.

117.    In fact, upon information and belief, Ms. Benson had suffered from similar mistreatment by Mr. Johnson, including harassment, the creation of a hostile working environment, yelling, demeaning, humiliating and ultimately, retaliating against Ms. Benson as a result of EEO allegations advanced against him.

<u>I Will Not Tolerate Your Panic Attacks or Voicing Other Concerns</u> (9/17/15)

118.    On the day immediately following Ms. Knight's complaints to Mr. Rader and the EEO office, she returned to work after utilizing two sick days stemming from her panic attacks and was *immediately* ordered into a meeting with Mr. Johnson, alone.

119.    Insofar as Mr. Johnson had caused or contributed to Ms. Knight's panic and anxiety attacks only days earlier, the fact that she had just formally lodged complaints against him and requested (once again) to be removed from his chain of command, and that fact that he treated her far worse in one-on-one meetings than in a group environment, Ms. Knight was in justifiable fear for her well being and terrified of meeting Mr. Johnson alone.

120.    For these reasons, Ms. Knight specifically told Mr. Johnson that she feared being alone with him, and requested that another person be present during the meeting.  However, her requests caused Mr. Johnson to become agitated and he flatly refused.

121.    Mr. Johnson began the meeting by stating that he intended to be direct with Ms. Knight and would not tolerate her panic attacks or her further voicing her concerns about him to Mr. Rader or others.  Mr. Johnson effectively told her that she needed to put-up and shut-up until she retired.

122.    At that point, Mr. Johnson explained that Ms. Knight would now be subject to hyper-workplace monitoring and scrutiny, and that she would be required to provide a daily plan and update on all her day to day activities.

123.    Mr. Johnson directed that, effective immediately, she would have to compile and provide Mr. Johnson with a complete assessment of what she had done or accomplished for that day and each day thereafter, along other strict monitoring requirements.

124.     Mr. Johnson's actions in this regard were meant to further diminish and torment Ms. Knight.  Mr. Johnson had already removed most of Ms. Knight's responsibilities and now he was demanding she provide a daily run down of each and every little thing she did.  Mr. Johnson's treatment was not only retaliatory but it reflected that Mr. Johnson had a belief that Ms. Knight was somehow mentally incompetent and unable to handle the most basic of tasks due to her disability.

125.     Mr. Johnson's behavior in this regard was demeaning and served to paint Ms. Knight as wholly subservient and stripped her of any remaining dignity she had as a professional in her work environment.

126.     Mr. Johnson did not impose this appalling micromanaging on his male employees or those that had not submitted complaints against him.

127.     Ms. Knight reported Mr. Johnson's behavior at this meeting to Mr. Rader and the EEO office, but no prompt, remedial action was taken to address his shocking statements and conditions placed upon her employment.

128.     In the ensuing days and weeks in the fall of 2015, on an almost daily and ongoing basis, Ms. Knight's work environment was laden with Mr. Johnson's poisonous temperament against her.

129.     Mr. Johnson would regularly harass Ms. Knight with emails demanding that he see everything before she could move forward on any task or duty of any kind.

130.     From a practical work perspective, this made it nearly impossible for Ms. Knight to perform her work because she was required to spend an inordinate amount of time just keeping Mr. Johnson updated on every minute detail of her work.

131.    Mr. Johnson did not want her to have any freedom or independence in her job and he continually treated Ms. Knight as if she were incompetent, refusing to recognize her role in any fashion.

132.    In addition to the overbearing scrutiny of the minute details of Ms. Knight's work, Mr. Johnson also began to act like a stalker by becoming hyper-vigilant of her specific detailed movements and physical whereabouts in the workplace each day, which was unnerving and caused exacerbation of Ms. Knight's disabilities.

<u>November 17, 2015</u>

133.    On November 17, 2015, Mr. Johnson had a new male administrative employee summon Ms. Knight and another female co-worker (Ms. Benson) for an immediate and unscheduled meeting in his office.

134.    Ms. Knight responded  she was working on something of extreme urgency and would be there in just a few short minutes.  However, less than one minute later, the administrative employee returned and stated, "Ms. Knight, Mr. Johnson told me to tell you that what he has is more important and that he wants you in his office NOW."

135.    Mr. Johnson's behavior towards Ms. Knight, as customary, was belittling, demeaning and humiliating.  Mr. Johnson knew that the work Ms. Knight was working on was very time sensitive, but nevertheless felt the need to demonstrate the subservience of Ms. Knight and another co-worker because he does not respect women and retaliates against women who have complained about him.  Mr. Johnson also knew that such arbitrary demands affected Ms. Knight's medical conditions and caused her to suffer increased anxiety.

136.    During the meeting, Mr. Johnson verbally berated and abused both Ms. Knight and her female co-worker, both of whom had recently lodged EEO complaints against him.  In

particular, Mr. Johnson accused Ms. Knight of sending out work without "notifying" him – an allegation that was completely false.

137.     The incident was particularly concerning because Ms. Knight was attempting to timely respond to a deadline and task, and Mr. Johnson had previously threatened that he would contact Civilian Personnel and take a personnel action against her if he could show that she failed to meet deadlines or perform tasks.

138.     Mr. Johnson ended the meeting by directing his two males employees (who were present as witnesses) to stay behind.  In earshot of Ms. Knight, Mr. Johnson then told the men that he wanted them to write a memo for record for what just happened in the meeting.

139.     Realizing that she was being wrongfully set-up, Ms. Knight then confronted Mr. Johnson and reminded him, once again, that he should not be treating women worse than men in the workplace.

<u>Exclusion for Thanksgiving Party</u>

140.     In late November of 2015, Mr. Johnson held a Thanksgiving party for the office and even sent out invitations.

141.     Neither Ms. Knight, nor Ms. Benson was invited.  They were the only two people in the office to not be invited to the Thanksgiving party.

<u>December 16, 2015</u>

142.     On or about December 16, 2015, a monthly Behavior Work Group meeting was held amongst certain members of the staff.

143.     During this meeting, one of the presenters specifically asked Ms. Knight who she reported to.  While Ms. Knight was answering the question, Mr. Johnson interrupted and rudely and dismissively stated:  "She doesn't even have a job description."

144.    To make matters worse, Ms. Johnson then turned to Ms. Knight in front of the group and dismissively and condescending stated:  "Did you take that 2 hour training? That is all she had as training. Then someone just shoved a phone in her hand and told her to answer the prevention hotline phone, she is not qualified to do that."

145.    Ms. Knight was embarrassed and mortified by these remarks, which were dismissive, rude, condescending and vindictive.  In an attempt to ameliorate the damage, Ms. Knight then explained to the group that she was an "old social worker/counselor and know how to manage that crisis hotline."

Constructive/Forced Retirement

146.    Throughout the fall and winter of 2015 and into 2016, Mr. Johnson continued on a near daily basis to harass Ms. Knight in both subtle and overt ways.

147.    These included, but were not limited to: mocking her job responsibilities, demeaning her in front of others, threatening her with discipline for voicing complaints, taking away her responsibilities, shutting her out of office activities, preventing her from obtaining training, effectively demoting her, deriding and mocking her disability, subjecting her to hyper-scrutiny, creating a toxic and hostile working environment, and subjecting her to disparate treatment in the terms, conditions and benefits of employment as generally set forth in this Lawsuit.

148.    Mr. Johnson also harassed and retaliated against other female co-workers in addition to Ms. Knight, and treated women, and, in particular, women whom complained, much worse than similarly situated male co-workers, including but not limited to Mr. Carheel, Mr. Lee, and two male Korean soldiers who were with the unit.

149.     Throughout this time frame, Ms. Knight repeatedly tried to get Mr. Johnson to stop his campaign of harassment, reprisal and discrimination.

150.     In particular, Ms. Knight told Mr. Johnson on countless occasions that he was retaliating and/or discriminating against her and asked him to stop, all to no avail.  She also filed informal and then formal EEO allegations and repeatedly informed Mr. Rader and others of the harassment, reprisal and discrimination she and others were suffering as a result of Mr. Johnson's shocking behavior.

151.     In addition, due to Ms. Knight's advancing age and disabilities, Mr. Johnson assumed that she would shortly retire and, as a result, would constantly badger, pressure, comment and try to otherwise force her to commit to a firm retirement date with the ultimate goal of forcing her out.

152.     On several occasions, Mr. Johnson actually refused to allow Ms. Knight training and held her out of assignments because he wanted her to commit to retire.

153.     As a result of Mr. Johnson's behavior and management's failure to ameliorate the extreme hostile work environment, Ms. Knight experienced extreme harm to her physical and mental well being, and a worsening of her mental disabilities.

154.     Management took no action to Mr. Johnson's continued discrimination and retaliation.

155.     Ms. Knight suffered severe emotional harm during the time she worked for Mr. Johnson and experienced a worsening of her disabilities, forcing her to retire.  All this caused Ms. Knight great emotional and economic harm.

**COUNT ONE**
**RETALIATION**
(Retaliation in the Terms and Conditions of Employment and Discharge of Employment)

156.     Ms. Knight incorporates by reference all allegations contained in paragraphs 1 through 155 of the Complaint as if more fully set forth herein.

157.     At all times relevant to this Lawsuit, Ms. Knight was an "employee" and the Agency was an "employer" within the meaning of Title VII.

158.     During the times specified in the Complaint, Ms. Knight engaged in protected activity by opposing, complaining and raising the Agency's illegal and discriminatory practices.

159.     Title VII makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding.

160.     The Agency violated Ms. Knight's right to equal employment opportunity by retaliating against Ms. Knight through continuously taking adverse actions against her and creating a hostile work environment which caused Ms. Knight ongoing emotional and psychological harm.  Ultimately, the conditions were so unbearable and Ms. Knight's emotional and psychological condition became so critical, that she was unable to return to work, all of which was a violation of the anti-retaliation provisions of Title VII.

WHEREFORE, Ms. Knight demands judgment against Defendant and seeks the following relief:

A.     Back pay, front pay, including benefits and matching of her retirement;

B.     Injunctive relief;

C.     Compensatory damages;

D.     Prevailing party attorneys' fees, expenses, and costs;

E.     Pre and Post-Judgment interest;

F.      And such other penalties and monetary, declaratory, and equitable relief as

the nature of her causes may permit.

## COUNT TWO
## GENDER DISCRIMINATION
(Discrimination in the Terms, Conditions and Discharge of Employment)

161.    Ms. Knight incorporates by reference all allegations contained in paragraphs 1

through 160 of the Complaint as if more fully set forth herein.

162.    At all times relevant to this Lawsuit, Ms. Knight was an "employee" and the

Agency was an "employer" within the meaning of the Title VII.

163.    The conduct as alleged throughout this Lawsuit constitutes discrimination and

disparate treatment based on gender in violation of Title VII.

WHEREFORE, Ms. Knight demands judgment against Defendant and seeks the

following relief:

A.      Back pay, front pay, including benefits and matching of her retirement;

B.       Injunctive relief;

C.      Compensatory damages;

D.      Prevailing party attorneys' fees, expenses, and costs;

E.      Pre and Post-Judgment interest;

F.      And such other penalties and monetary, declaratory, and equitable relief as

the nature of her causes may permit.

## COUNT THREE
## DISABILITY DISCRIMINATION
(Discrimination in the Terms, Conditions and Discharge of Employment)

164.    Ms. Knight incorporates by reference all allegations contained in paragraphs 1

through 163 of the Complaint as if more fully set forth herein.

27

165.    At all times relevant to this Complaint, Ms. Knight was an "employee" and the Agency was an "employer" within the meaning of the Rehab Act.

166.    The conduct as alleged throughout this Lawsuit constitutes discrimination and disparate treatment based on disability in violation of the Rehab Act.

WHEREFORE, Ms. Knight demands judgment against Defendant and seeks the following relief:

      A.    Back pay, front pay, including benefits and matching of her retirement;

      B.    Injunctive relief;

      C.    Compensatory damages;

      D.    Prevailing party attorneys' fees, expenses, and costs;

      E.    Pre and Post-Judgment interest;

      F.    And such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## COUNT FOUR
## DISABILITY DISCRIMINATION
### (Failure to Reasonably Accommodate)

167.    Ms. Knight incorporates by reference all allegations contained in paragraphs 1 through 166 of the Complaint as if more fully set forth herein.

168.    At all times relevant to this Complaint, Ms. Knight was an "employee" and the Agency was an "employer" within the meaning of the Rehab Act.

169.    The conduct as alleged throughout this Lawsuit constitutes disability discrimination based on failure to accommodate in violation of the Rehab Act.

WHEREFORE, Ms. Knight demands judgment against Defendant and seeks the following relief:

A.      Back pay, front pay, including benefits and matching of her retirement;

B.      Injunctive relief;

C.      Compensatory damages;

D.      Prevailing party attorneys' fees, expenses, and costs;

E.      Pre and Post-Judgment interest;

F.      And such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## COUNT FIVE
## HOSTILE WORKING ENVIRONMENT

170.    Ms. Knight incorporates by reference all allegations contained in paragraphs 1 through 169 of the Complaint as if more fully set forth herein.

171.    At all times relevant to this Complaint, Ms. Knight was an "employee" and the Agency was an "employer" within the meaning of Title VII and the Rehab Act.

172.    The conduct as alleged throughout this Lawsuit constitutes unwelcome harassment on the basis of gender and disability that was severe and pervasive, and that altered the conditions of her employment and created an abusive atmosphere.

173.    The Agency knew about the hostile work environment against Ms. Knight because Ms. Knight repeatedly complained to management personnel who were required to investigate and stop the offending conduct.

174.    These persons either failed to take action, or negligently performed a sham investigation which failed to promptly address and remediate the harassment in question, resulting in retaliation against Ms. Knight.

175.    The Agency violated Ms. Knight's right to equal employment opportunity by allowing and failing to rectify a hostile work environment based on her gender and disability in

violation of Title VII and the Rehab Act, which environment became increasingly caustic and harmful, all the while causing Ms. Knight ongoing emotional and psychological harm. Ultimately, the conditions were so unbearable and Ms. Knight's emotional and psychological condition became so critical, that she was unable to return to work, all due to the hostile work environment.

WHEREFORE, Ms. Knight demands judgment against Defendant and seeks the following relief:

A.    Back pay, front pay, including benefits and matching of her retirement;

B.    Injunctive relief;

C.    Compensatory damages;

D.    Prevailing party attorneys' fees, expenses, and costs;

E.    Pre and Post-Judgment interest;

F.    And such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## DEMAND FOR TRIAL BY JURY

Ms. Knight demands a trial by jury in this action on all claims in this Lawsuit.

Respectfully Submitted,

_____/s/_____
Ruth Ann Azeredo  (No. 16175)
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, MD  21401
(410) 558-1915
(410) 558-1917 Fax
ruthazeredo@comcast.net

AND

_____/s/_____
Timothy W. Romberger
No. 014408

1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20046
(202) 248-5053
(703) 582-6494 Cell
timromberger1@comcast.net

Date: October 26, 2018